In re HARRIS' ESTATE
ZION'S SAVINGS BANK & TRUST CO. v. HARRIS

No. 6238.   Decided September 13, 1940.   (105 P. 2d 461.)

*Thomas & Thomas,* of Salt Lake City, for appellant.

*J. D. Skeen* and *E. J. Skeen,* both of Salt Lake City, for respondent.

MOFFAT, Chief Justice.

On the 16th day of January, 1939, Sterling P. Harris filed his unverified petition in the Probate Division of the District Court of Salt Lake County for letters of administration upon the estate of Anna L. Harris, his deceased wife.

At the time of the death of Anna L. Harris there was pending in the United States District Court for the District of Utah a proceeding under Section 75 of the Bankruptcy Act, 11 U. S. C. A. § 203. That proceeding abated by the death of Anna L. Harris.

February 10, 1940, Sterling P. Harris, as administrator of the estate of Anna L. Harris, filed a petition in the District Court of the Third Judicial District of the State of Utah for Salt Lake County, alleging "that unless said proceeding is revived and reinstated, the entire estate of said deceased is in danger of being lost." The petitioner prayed for an order authorizing him to apply to the United States District Court for an order reviving and reinstating the debtor relief petition of Anna L. Harris, deceased.

The Probate Court granted the petition and entered an order authorizing the administrator to apply to the United States District Court for an order reviving and reinstating the debtor relief proceedings. The administrator asks leave of the probate court to seek the benefits of section 75 in the bankruptcy court. Two months after the death of Anna L. Harris the Probate Court appointed respondent administrator of his deceased wife's estate.

Thereafter Zion's Savings Bank and Trust Company, the holder of a mortgage, proceeded to foreclose its mortgage. Judgment of foreclosure was entered. A sheriff's sale was had and a certificate of sale was issued to the bank as purchaser for the full amount of the judgment. Just before the redemption period expired entitling the bank to a sheriff's deed, the respondent administrator petitioned the probate court for leave to apply in the federal court for a revivor of the bankruptcy proceedings. The petition was

granted and order made, but stayed pending appeal by the bank and upon giving a supersedeas bond. The bond was given and appeal taken.

Appellant assigns and argues it was error for the Probate Court of Salt Lake County to grant the petition and make the order authorizing the administrator to apply to the United States court.

The question here is not whether the Frazier-Lemke Act permits the administrator of a deceased farmer to file a petition for debtor's relief under the moratorium provisions of the act, but whether the Probate Court has the authority to authorize an administrator to file such a petition in the United States District Court in the abated bankruptcy proceeding.

An administrator desiring to seek the benefit of the Frazier-Lemke Act is required under the provisions of the act to first obtain the authority of the Probate Court which appointed him and to exhibit in his petition to the federal court his appointment and authorization.

The privilege conferred by the act in event a legal authorization is made by a court having power to do so is contained in Section 9:

"(9) The personal representative of a deceased farmer who desires in his representative capacity to effect, *under section 75, a composition* or extension of the debts of the estate, shall attach to his petition, in lieu of schedules, the following papers * * *

"(a) a copy of the order of his appointment, (b) a copy of an order of the probate court authorizing him to file the petition." (Italics ours) General Order 50 (9), 11 U. S. C. A. following section 53.

The source of the administrator's power and that of the probate court must be found in the Probate Code. Nowhere in the Probate Code is there any power expressed authorizing an administrator to resort to the Frazier-Lemke Act or permitting the probate court to authorize him to do so. Federal courts have no jurisdiction in probate matters in respect to the administration of the

estates of deceased persons. 2 Hughes Federal Practice, Jurisdiction and Procedure, § 985.

"Proceedings for the administration of estates of decedent's are purely statutory." 1 Bancroft's Probate Practice, p. 76, § 37.

"Jurisdiction of the Probate Courts to administer upon the estate of decedents is primary and exclusive." 1 Bancroft's Probate Practice, p. 62, § 33.

"The court, sitting in probate, derives its power from the statutes and has only such powers as are granted by statute or reasonably implied or reasonably necessary and proper to effectuate the powers which are given." *In re Cloward's Estate*, 95 Utah 453, 82 P. 2d 336, 339, 119 A. L. R. 123.

The problem presents the anomaly, if allowed, of a probate court divesting itself of the management of the estate and permitting its appointee who represents the interests of the heirs, if there are any heirs of the deceased, to be subjected to the jurisdiction of another tribunal.

The administrator is neither a debtor nor a bankrupt, and has only the control of the property for the purpose of pursuing the statutory probate proceedings in order that the heirs may receive what there is remaining after the expenses of administration have been paid and the claims of creditors have been satisfied. What would be the method of unraveling a situation if an administrator should die or resign and another should apply for appointment who was unwilling to ask for permission to come under the provisions of the bankruptcy act?

Where a similar matter has reached the federal courts, two of them have been denied the privilege of the conciliatory provisions of the bankruptcy act and one has allowed it. *In re Reynolds*, D. C. Okl., 21 F. Supp. 369; and *In re Buxton's Estate*, D. C. Ill., 14 F. Supp. 616, 617. Contra, *Hines* v. *Farkas*, 5 Cir., 109 F. 2d 289.

The case of *In re Reynolds*, supra, involved the Probate Code of Oklahoma and was decided by a federal district court there in 1937. The administrator petitioned the federal court to revive the proceedings and was met with a

motion to dismiss the entire cause on the grounds that title to the real property vested immediately in the heirs under the Oklahoma law. The section in question (O. S. 1931, Sec. 1615, 84 Okl. St. Am. § 212) practically identical with our own Section 101-4-2, R. S. Utah 1933, is as follows:

"The property, both real and personal, of one who dies without disposing of it by will, passes to the heirs of the intestate, subject to the control of the county court, and to the possession of any administrator appointed by that court for the purpose of administration."

The federal court, bound as it was thereby, looked to the state court decisions on the subject of descent and said that the Oklahoma Supreme Court had commented on this section several times and quoted from the state court in *Seal* v. *Banes*, 168 Okl. 550, 35 P. 2d 704, 705:

"Upon a person dying intestate, the heirs of such person become immediately vested with the estate, and the estate is indefeasible, subject to the control of the county court and the possession of and management by the administrator, and it is his duty simply to preserve the estate until distribution to the heirs, unless, and in the manner provided by statute, the necessity should arise for a sale."

The court also quotes from another state court decision, *In re Hibdon's Estate*, 102 Okl. 145, 228 P. 154:

" 'Under section 11300, C. L. 1921 (84 Okl. St. Ann., § 212), all property, both real and personal, of all persons who die intestate passes to the heirs of such intestate, subject to the control of the county court and subject to administration.' " The court further stated:

"The question of whether or not an administrator can maintain an action in bankruptcy under section 75 of the Bankruptcy Act has not been passed upon by the higher courts, but in an opinion involving the same substantial provisions of the statutes of Illinois as are contained in the Oklahoma Statutes, with reference to the powers of executors and administrators, the District Court for the Eastern District of Illinois, in the case of *In re Buxton's Estate*, 14 F. Supp. 616, has held (quoting from the sixth syllabus): 'Deceased farmer's administrator, appointed under Illinois law, could not be adjudicated a bankrupt under statute, notwithstanding statute includes personal representative of deceased farmer within designation of "farmer,"

in view of limited authority of administrator over decedent's real estate under Illinois law and his consequent inability to subject decedent's real estate to provisions of statute (Bankr. Act § 75 (r, s), as amended, 11 U. S. C. A. § 203 (r, s).'

"The Illinois statute is so similar to the Oklahoma statute that the court cannot conceive of a different conclusion under the circumstances of this case, than that reached by Judge Wham in the Illinois case. It is the judgment of the court that the administrator cannot maintain this action." [21 F. Supp. 370.]

Thus, under statutory provisions identical with those of our own Probate Code regarding descents of real property the court held the administrator was without authority to maintain the Frazier-Lemke proceedings and they were dismissed.

The Illinois court stated [14 F. Supp. 618]:

"May an administrator of the estate of a deceased farmer appointed under the law of Illinois be lawfully adjudicated a bankrupt under said subsection (s) in view of the fact that said subsection opens the door of bankruptcy thereunder to 'any farmer,' and that subsection (r) of said section 75 * * * 'includes the personal representative of a deceased farmer'?

"My conclusion is that while the term 'personal representative' as used in subsection (r) of section 75, may be broad enough to include all executors and administrators of estate of deceased farmers, it does not follow that all executors and administrators may lawfully enter into bankruptcy. It was not the purpose of Congress through this legislation to attempt to add to or remove limits from the power and authority conferred by a state statute upon a personal representative created solely by virtue of such statute through an order of court authorized therein as is an administrator of an estate of a deceased person under the laws of Illinois. Rather it would seem that the sole purpose of Congress was to make sections 74 and 75 of the Bankruptcy Act * * * (11 U. S. C. A. §§ 202, 203), available to those personal representatives of deceased farmers who by statute, will, or other creating means are given sufficiently broad powers * * * to take advantage, depending on the extent of such power, of all or part of the provisions of said sections."

As to the administrator's power under the Illinois law it is said:

"Administrator of an estate of a deceased person in Illinois is appointed under statutes giving him strictly limited powers. Being a creature of statute, he must derive his entire authority thereunder. * * *

"An administrator takes no title to real estate, either legal or equitable, but it descends to and vests in the heirs at once upon the death of the ancestor."

Then coming to the administrator and the Frazier-Lemke Act, the court concludes:

"Accepting the foregoing as an accurate statement of the very limited powers of an administrator under the laws of Illinois, it is difficult to see how he could, within the limitation of those powers, lawfully take advantage of said subsection (s) in so far as it applies to real estate. For him to do so would require him to take and for a period of three years retain possession of the real estate which on the death of his decedent, vested in the heirs at law * * *."

The Illinois federal court then finally concluded that the administrator with his limited power and authority over the real estate cannot subject it to the provisions of Section 75 and granted the motion to dismiss.

In re Reynolds and In re Buxton are distinguishable from the case of Hines v. Farkas in that the last case was based on a statute different from the statute construed in the first two cases. The Georgia statute differs from the Utah Probate Code, and the applicant was a special administrator whose powers are limited to the preservation of the assets of the estate. In so far as any of the federal cases may be considered, we think the position taken in the cases of In re Reynolds and In re Buxton's estates accord with our statute and our views.

Our Probate Code nowhere authorizes an administrator to resort to the Frazier-Lemke Act, nor does it permit the probate court to authorize him to do so. Neither the administrator nor the probate court has any power express or implied to permit one to carry the estate out of the power of the probate court or the latter to divest itself of jurisdiction and permit the estate and its officer

to become subject to another tribunal from which neither may be reclaimed.

The court erred in entering its order and the same is reversed. The order should be vacated and set aside. Such is the order. Costs to appellant.

LARSON, McDONOUGH, and PRATT, JJ., concur.

WOLFE, Justice (concurring in the results).

As I see this case, the controlling question is: Does the constitutional power of Congress to establish "uniform Laws on the subject of Bankruptcies throughout the United States" (Sec. 8, Art. 1, Const. U. S.) go to the extent of permitting Congress to deal with the property of a deceased person who was never declared a bankrupt, although had he lived he might have taken advantage of Sec. 75, subsection (s) of the Bankruptcy Act? Title 11, Sec. 203, U. S. C. A. Neither the briefs nor the main opinion treats of this question, for the reason, perhaps, that is was considered unnecessary to do so in view of the conclusion that under our Probate Code the personal representative had no power, nor had the District Court power to permit him, to resort to the Bankruptcy Statute, and in view of the further fact that no court, Federal or State, at least not to my knowledge, has passed upon the question. And yet, I think that the outcome of this case depends mainly upon resolving that question. I state my reasons for thinking so; but because Federal Courts have not passed on the question and because this opinion can be merely suggestive, I shall rather pose and discuss the questions than express any positive opinion thereon.

Sec. 75, subsection (r), of the Bankruptcy Act provides:

"For the purposes of this section * * * the term 'farmer' * * * includes the personal representative of a deceased farmer."

If the power of Congress does not go to the extent of dealing with deceased's insolvent estate, that ends the

matter. The results of the main opinion could then be upheld but on different grounds from those stated therein. If, on the other hand, the Congressional power does go to that extent it would seem that the fact that the Probate Code gives the representative no express or implied power to resort to the bankruptcy court, nor the court any power to permit him to do so, nor any power to permit decedent's property to be administered by the bankruptcy courts, can have no bearing in the matter. The Act of Congress would be paramount and would be just as controlling as to an insolvent decedent's farm as it would be to a living insolvent's farm. If the power exists, it would appear that it would be paramount even in the face of a state statute which expressly forbade any other tribunal or court taking cognizance of property of a decedent to which the jurisdiction of the Probate Court had attached. And it certainly would control in the case where there was no such restriction or prohibition in the Probate Court.

The situation it not one where the personal representative is acting as a statutory agent for the bringing of an action for negligence for the benefit of a class such as under Sec. 104-3-11, R. S. U. 1933, or under the Federal Employers' Liability Act, U. S. C. A. Vol. 45, Chap. 2, Sec. 51. In such case the personal representative acts dehors probate administration and by virtue of his statue. But if the bankruptcy jurisdiction of Congress extends to subjecting a deceased's insolvent property to bankruptcy administration, it would seem that the probate court could not withhold permission of the personal representative to apply to the bankruptcy court. The only person who could apply, under subsection (r), is the personal representative. The heirs of the deceased insolvent cannot apply. If, then, Congress has the power to extend bankruptcy to the property of a deceased insolvent debtor, it would seem that the probate court could not withhold permission; that the personal representative need not seek permission of the court to apply, for where the court has no discretion to deny and must grant per-

mission to apply, seeking permission would be a useless formality.

But, General Order 50 (9) promulgated by the Supreme Court of the United States on January 16, 1939, provides that

"the personal representative of a deceased farmer who desires in his representative capacity to effect, under section 75, a composition or extension of the debts of the estate, shall attach to his petition, in lieu of schedules, the following papers, certified as correct by the court which appointed him * * * (a) a copy of the order of his appointment, (b) a copy of an order of the probate court *authorizing* him to file the petition." (Italics added.)

The Supreme Court must have recognized that there was a discretion in the probate court; otherwise it would not require authorization where it could not be in any case withheld.

It may be that the Sec. 75, subsection (r), should be construed to read that the term "farmer" includes the personal representative of a deceased "farmer" whenever the probate law of the state permits the personal representative to apply under this section (sec. 75). Such construction would at least remove any question of whether the bankruptcy powers of Congress would supersede the probate powers of the courts in the case of insolvent decedents where there was a conflict, but does not solve the question whether at all events the bankruptcy powers may constitutionally encompass the jurisdiction over the property of an insolvent decedent. If this be the construction adopted by the federal courts, the approach of the main decision would be correct. It would then definitely decide that subsection (r) was not applicable so far as this state is concerned because our laws did not permit the representation to apply.

Or General Order 50 (9) may contemplate that Sec. 75 of the Bankruptcy Act meant only to give the personal representative the advantage of subsections (a) to (r), inclusive, relating to composition and extension of debts and

not of subsection (s) relating to moratorium. It speaks only of "a composition or extension of the debts." If this were the situation, subsection (r) could be meshed with the probate practice of the various states. The personal representative then would not have power to subject the property to the bankruptcy court and obtain its discharge from creditors but would only have power to use the machinery of bankruptcy to attempt to effect a conciliation and extension and then only if the probate statutes permitted such resort and the court permitted him to apply. And the holding of the main opinion would be final to the effect that our statutes gave no such power.

If Sec. 75 was intended, however, to extend to the deceased insolvent farmer's estate the full benefits of all the subsections of the Act, we have not only the question of whether Congress can constitutionally act at all in reference to such estate, but how, as a practical matter, the whole scheme can mesh with probate administration.

The farm, by death of its owner, has passed to the heirs subject to possession by the administrator and is liable for payment of the decedent's debts. Perhaps the heirs could object to their property being subjected to the operation of the Bankruptcy Act even though in this case it would seem wholly to their interest and for their benefit. We will assume that if the personal representative desires to take advantage of subsection (s) of Sec. 75 of the Federal Bankruptcy Act, it is with the tacit consent of the heirs. Does the power of the United States over bankruptcy extend to and encompass property of a decedent who was never declared a bankrupt, although he was actually so at the time of his death?

In *Local Loan Vo.* v. *Hunt,* 292 U. S. 234, 244, 54 S. Ct. 695, 699, 78 L. Ed. 1230, 93 A. L. R. 195, the purposes of the Bankruptcy Act are well stated:

"* * * to 'relieve the honest debtor from the weight of oppressive indebtedness, and permit him to start afresh free from the obligations to responsibilities consequent upon business misfortunes.'"

and to give him "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt."

The U. S. Constitution gave Congress the power to pass a uniform law because a bankrupt's creditors were, in many cases, national and if he were to be free of debt he had to be free from creditors everywhere and not only from those who might choose to avail themselves of the procedure set up by the debtor's state. But where the bankrupt dies, he is no longer in position to pursue new opportunities in life. Death has relieved him of any harassment of creditors. His heirs cannot be sued for his debts. If he had taken bankruptcy he would have surrendered his unexempt property to his creditors as a condition for a complete discharge. But upon his death his property is surrendered to his personal representatives to the extent necessary to pay debts, etc., and if the estate is insolvent only his creditors are interested. In such case his property is applied to his debts, secured and unsecured, in probate just as if he were living and asked discharge from his debts. In one case, death relieves him from his creditors and his property is applied by probate to pay his debts. In bankruptcy, the Act discharges his debts whilst his unexempt property goes to his creditors. But, as Mr. Justice Brandeis observed in *Louisville Joint Stock Land Bank* v. *Radford*, 295 U. S. 555, 55 S. Ct. 854, 860, 79 L. Ed. 1593, 97 A. L. R. 1106, no bankruptcy act until the Chandler Act (which incorporated the provisions of the Frazier-Lemke Act as Sec. 75) had ever "undertaken to supply [the debtor with] capital with which to engage in business in the future" and certainly no bankruptcy act had ever attempted to save for the heirs of the bankrupt any of his property by modification in "the interest of either the [heirs] or other creditors [of] any substantive right of the holder of a mortgage valid under federal law" ("heirs" substituted for "debtor" in the quotation from the Radford case).

But taking the Radford case and the case of *Wright* v. *Vinton Branch of Mountain Trust Bank*, 300 U. S. 440, 57 S. Ct. 556, 559, 81 L. Ed. 736, 112 A. L. R. 1455, together, there now seems to be no doubt that the bankruptcy power of Congress goes to the extent of offering "distressed farmers the aid of a means of rehabilitation." The original Frazier-Lemke Act was held unconstitutional not because it went to the extent of rehabilitation rather than mere discharge, but because it "effected a substantial impairment of the mortgagee's security" and therefore ran athwart of the Fifth Amendment to which the bankruptcy power is subject. But the question still remains: Does the bankruptcy power go to the extent of offering the personal representative of an insolvent deceased farmer the means of rehabilitation for the benefit of the heirs?

Certainly the original and amended Frazier-Lemke Act in relation to a living bankrupt farmer went further than had any previous bankruptcy act, not only in degree, but in nature of relief offered. Some states had given debtors extensive exemptions of unencumbered property from liability for seizure in satisfaction of debts; and the Bankruptcy Act of 1867 and 1898 had recognized these exemptions. "The first bankruptcy act provided only for compulsory proceedings against traders, bankers, brokers and underwriters." Later ones were extended to include practically all insolvent debtors and to provide for voluntary petitions and to permit compositions with creditors even without adjudication of bankruptcy, thus making the discharge of the debtor a matter of concern as well as the distribution of his property—the original purpose of the bankruptcy acts. As said in the Radford case:

"Bankruptcy acts had, either expressly, or by implication, as was held in *Van Huffel* v. *Harkelrode*, 284 U. S. 225, 227, 52 S. Ct. 115, 116, 76 L. Ed. 256, 78 A. L. R. 453, authorized the court to direct, in the interest of other creditors, that all liens upon property forming a part of the bankrupt's estate be marshaled; that the property be sold free of encumbrances; and that the rights of all lienholders be transferred to the proceeds of the sale—a power which 'had long been

exercised by federal courts sitting in equity when ordering sales by receivers or on foreclosure.' "

But all these changes, outside of permitting a debtor to apply for composition without declaration of bankruptcy, had been extensions of the class to which bankruptcy was available or of the means or devices for administering the bankrupt estates to the best advantage. Permitting a merchant not insolvent to apply for composition was the first change in the nature or fundamental purposes of bankruptcy. The next, even more vast in its implications, was the idea of rehabilitation of the bankrupt farmer brought forward in the Frazier-Lemke Act. This Act intruded into the fundamental purposes of bankruptcy the idea of preserving the homestead as a means of keeping the family together in a locale and providing it with the means of subsistence. This was, no doubt, the idea in offering the same means to the personal representative, although in many cases the deceased insolvent farmer might have been along in years and have had no family about him. In such cases the power could be used not for rehabilitation but for saving to the heirs part of the estate which might otherwise have gone to the creditors.

This development of the application of Congressional powers over bankruptcy from one of a compulsory distribution of the property of a certain class of debtors among different classes of creditors, through the state of enlarging the class of debtors and making resort to the Act voluntary, then placing the emphasis on discharge of the debtor instead of distribution of property to creditors by establishing mechanism for compositions, to one finally of looking to the rehabilitation of the debtor, all still pertained to the debtor and creditor relationship. None of these changes essayed an attempt to provide for the interests of the debtor's family after his demise by continuing the process of rehabilitation for the benefit of his family and/or his heirs. The march of legislation in using its reserve powers of bankruptcy coincides largely with the social needs

dictated by the times. And it is suspected that this lies at the bottom of the broad views which the Supreme Court took as to this new use of bankruptcy powers and, perhaps, justifiably so. Social needs must play their part in constitutional interpretation even at the sacrifice of logic and loyalty to concept. Where thousands of farmers were being ejected from their farms to become mere tenants, or, worse still, to drift into the cities or around the country with no longer any land tie, giving rise to family disruption and a great increase in the proletariat, it was better to forsake logic and concept, even though with reluctance, in order legally and judicially to cope with the situation. But, as before stated, in all this change the concept of relief to a debtor either in permitting him to start over again free of debt, and then to the point of assisting him in rehabilitation by aids in preserving to him his property was adhered to. Extending that help to those who never were debtors, and who in the sense never could be harassed, constituted another great departure. From the standpoint of human and national welfare it may be as important, or even more so, to offer aids to preserve the home when the breadwinning head of it is taken away by death as when he is alive and harassed by creditors. But where there is no family to continue together but only heirs who are sui juris and perhaps fully able to carry on without requiring the creditors to contribute to their capital, this social reason disappears.

It may be that the U. S. Supreme Court desired to recognize a discretion in the state courts as regards the situation of the deceased farmer's family in this regard by requiring, by General Order 50(9), the administrator first to obtain its authority as a condition of applying to the bankruptcy courts. But quere: Could the making of that order be pushed to the point of implying a recognition by Supreme Court that the power of Congress extended to providing means for deceased farmer's family to carry on by holding off the lienholder? That question should be squarely

presented to and decided by the Supreme Court before we can definitely say whether Sec. 75, subsection (r), of the Bankruptcy Act is constitutional.

I confess I have grave doubts as to the constitutionality of subsection (r), but I do not feel that it is encumbent upon me here to resolve those doubts. If the subsection is constitutional it would, if taken literally, confer on the personal representative a power which is not dependent on the action of our courts and by his application to the bankruptcy courts it would place the property under the jurisdiction of the federal courts. If this power in bankruptcy matters extends to rehabilitation of the deceased farmer's estate it may extend to rehabilitation of that of the workingman and small merchant and to their families, and the net results may be to transfer the administration of many pieces of property from the probate to the federal courts, which would delay the closing of small estates in probate for long periods of time and thus increase the expense. But if such is the result of a power constitutionally exercised, we must abide the consequences.

At this point I return to the matter of the bases for the use of the probate court's discretion in granting the authorization implied under General Order 50(9), which it must be assumed the Supreme Court of the United States recognized as residing in the probate court. Certainly if the probate court had discretion to refuse or grant authorization to permit the personal representative to apply to the federal court under Sec. 75, Subsection (s), of the Bankruptcy Act, that discretion must rest on certain bases. The two outstanding bases are (1) the presence or absence of a reasonable probability of a fair settlement with the creditors with a fair prospect of salvaging the farm: (2) the presence or absence of dependents which the farm helped to support. In *John Hancock Mutual Life Insurance Co.* v. *Bartels,* 308 U. S. 180, 60 S. Ct. 221, 223, 84 L. Ed. 176, the Supreme Court speaking through Mr. Chief Justice Hughes stated that:

"The subsections of Section 75 which regulate the procedure in relation to the effort of a farmer-debtor to obtain a composition or extension contain no provision for a dismissal because of the absence of a reasonable probability of the financial rehabilitation of the debtor."

And, in a footnote, that:

"What is said upon this point in Note 6 in *Wright* v. *Vinton Branch*, 300 U. S. 440, 462, 57 S. Ct. 556, 561 81 L. Ed. 736, 112 A. L. R. 1455, was not essential to the opinion in that case and is not supported by the terms of the statute."

It seems to the writer that in the Wright case such element was held necessary by Mr. Justice Brandeis in order to sustain the constitutionality of the amended Frazier-Lemke Act. Otherwise, the debtor would have had an absolute right to retain the property for three years as against his mortgagee. Justice Brandeis evidently thought that this might be a denial of due process. All the justices concurred in the Wright case and all concurred in the Bartels case—Mr. Justice Brandeis having in the meantime resigned from the court. But perhaps that is the way the law grows. A difficulty is surmounted by construing with limitations. The next case abolishes the limitations on the construction, hence the difficulty and the limitation disappear. Be that as it may, the element of reasonable probability of salvage, although not to be read into Sec. 75 where a debtor is before the court, may be one of the bases on which rests the discretion of the probate court in its granting or refusing a petition by the personal representative of a debtor to subject the decedent's farm to the operation of the Bankruptcy Act. That, together with element of dependency of a family on the farm, would seem to form the chief bases upon which the discretion of the probate court could rest. But immediately this is said, a horde of questions thrust themselves into the mind. If there is other property besides the farm must it not also be transferred to the bankruptcy court? Would not all the assets be transferred to the bankruptcy courts? Would not the claims of all the decedent's

creditors be required to be transferred to that court? How
else could the farm finally come back to probate freed of
debts? And when it did so come back, how can it remain
to support dependants if there are any adult heirs who
could insist on distribution? Certainly the bankruptcy
laws could not change the course of devolution. How then
in any event could the farm be saved for dependents? All
these and other questions strongly suggest that the admin-
istration and liquidation of an insolvent decedent's estate
must remain with the probate court. There might be other
elements which would also take the mortagee into account.
He should not be altogether forgotten. How long had the
creditor already been delayed in resorting to his security?
What might be the probable effect of further delay on his
rights? The "implications" of General Order 50 (9) involve
a recognition by the U. S. Supreme Court, of a discretion
in the probate court.

If, therefore, the probate court has discretion, we must
ask ourselves in this case whether the court abused its dis-
cretion in permitting the administrator to apply to the fed-
eral court to revive and to reinstate the debtor relief pro-
ceedings. I assume there is no difference between the
power to initiate and to revive. Certainly if a personal
representative has power to initiate he has power to revive
and if it requires an order of the probate court to permit
him to initiate it would also require an order to revive.
The record shows no evidence upon which the court could
exercise its discretion. A petition asking to revive was filed.
It was noticed for February 10, 1940, arguments heard and
an order granting the administrator authorization to apply
to the federal court was granted. The court evidently
thought the administrator had a right in law to apply and
that the order permitting him to do so was a formality.
But I cannot think the Supreme Court of the United States
would require under General Order 50 (9) an order by
the probate court which in any event it was bound to make.
I think the order of the probate court should be set aside.

But until the questions presented in this opinion are resolved by the Supreme Court of the U. S. it is doubtful whether it should be with instructions to dismiss the petition or with instructions to take evidence and to exercise its sound discretion on such evidence.

Before closing this opinion, I shall make several observations in regard to the main opinion with the results of which I feel in sympathy. Its implications may go further than intended.

I think probate practice encompasses prudent business administration and management of an estate within the limits of the law. Much that is not specifically granted by the statutes may be done because it is within the circle of granted powers and necessary or convenient to effectuate them. I do not think the powers given by the Probate Code should be too narrowly construed. There may be situations arise which might well call for the use of such facilities or instrumentalities in the orderly and businesslike administration of estates and which might redound to the advantage of all parties interested therein, which should not be precluded even though such facilities were legal procedures available in other courts or agencies. And this is so even though such facilities might involve, to some extent, machinery designed to facilitate findings necessary or convenient to administration or to aid in the administration, liquidation, or settlement of the estate or claims against the same and even though it might involve a judgment which might be binding on the administrator. *Hines* v. *Farkas,* 5 Cir., 109 F. 2d 289. The order permitting resort to the federal court was to obtain an "order reviving and reinstating the debtor relief proceedings or instituting new proceedings in said court." This apparently intended to permit resort to the federal court for all purposes under Sec. 75 of the Bankruptcy Act—that is, not only under section (a) to (r) which deal with composition, but with the "amendment" whereby the farmer asks to be adjudicated a bankrupt and which automatically permits the debtor to buy off

his creditors for the appraised value of the property. In the case of *Bacon* v. *Federal Land Bank of Columbia,* 5 Cir., 109 F. 2d 285, it was held the "debtor" is not initially, under Sec. 75, a "bankrupt" but comes in as an applicant seeking the facilities of the Act for composition. It is only after he "amends" that he may be declared a "voluntary bankrupt". Whether the administrator without an order from the probate court, or by virtue of an order, could have taken advantage of sections (a) to (r), inclusive, of Sec. 75 of the Bankruptcy Act, is a question which the main opinion answers in the negative because it holds that the administrator cannot use the facilities of any part of Sec. 75 of the Bankruptcy Act. But perhaps the facilities of Sec. 75 may be split and the administrator may, without order of the probate court, use provisions (a) to (r), inclusive, in order to attempt a composition but not subsection (s) which by amendment brings into operation mechanism whereby the property is subjected to appraisal and the creditor compelled to take the appraised value or wait for three years. I have before stated that this feature may play its part in the consideration of the constitutionality of subsection (s). If the main opinion is correct in its conclusion that the court has no power to permit, nor the administrator himself power to resort to any legal facilities to effect a composition with creditors outside of that given by the Probate Code, the administrator could not, of course, take advantage of subsections (a) to (r). Until better advised I shall concur with the results of the main opinion.

(NOTE: January 16, 1941, the record in this case was removed on certiorari to the Supreme Court of the United States).